**Jimmie Lee CLARK, Petitioner,**

v.

**R.C. MARSHALL, Respondent.**

**Civ. A. No. C80–110.**

United States District Court,
N.D. Ohio, E.D.

Jan. 22, 1985.

There is no such "were paid" language in the

Albert Purola, John Winthrop Ours, Willoughby, Ohio, for petitioner.

amended § 1320a–6.

Richard David Drake, Asst. Atty. Gen., Columbus, Ohio, for respondent.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

On March 22, 1976, a jury in the Court of Common Pleas for Lake County, Ohio found Jimmie Lee Clark guilty of aggravated murder under Ohio Rev.Code § 2903.01 and aggravated robbery under Ohio Rev. Code § 2911.01. Clark was sentenced to life imprisonment on the first count and seven to twenty-five years on the second count. The Court of Appeals affirmed the convictions, *State v. Clark*, No. 6–017 (11th Dist. May 31, 1977), as did the Ohio Supreme Court. *State v. Clark*, 55 Ohio St.2d 257, 379 N.E.2d 597 (1978). The Supreme Court denied Clark's petition for a writ of certiorari. *Clark v. Ohio*, 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).

Clark commenced this action under 28 U.S.C. § 2254 on January 25, 1980 by filing an application to proceed in forma pauperis. After the case was transferred to this Court's docket, the request was granted on June 18, 1980 and Clark's petition for writ of habeas corpus was filed. On December 10, 1980, this Court adopted the magistrate's report and recommendation, to which Clark had not objected, and denied the petition. Clark then appealed. The Sixth Circuit Court of Appeals determined that the jury instructions on the aggravated murder charge violated the Due Process Clause of the Fourteenth Amendment, and directed this Court to order Clark's release from custody unless the State chose to retry him. With respect to the aggravated robbery conviction, the court decried the state court's failure to make findings of fact and conclusions of law at the close of a suppression hearing and ordered this Court to conduct an evidentiary hearing to determine whether Clark's statements to police were constitutionally admissible. *Clark v. Jago*, 676 F.2d 1099 (6th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

After the Supreme Court denied the State's petition for a writ of certiorari and the Sixth Circuit transmitted its mandate to this Court, an evidentiary hearing was conducted on July 20, 1984 and August 7, 1984. Upon consideration of the documentary evidence and testimony presented at that hearing, and upon review of the record in its entirety, this Court concludes that Clark was denied his Fifth and Fourteenth Amendment right to presence of counsel and that incriminating statements he made while deprived of counsel should not have been admitted before the jury. The petition must be granted and the writ of habeas corpus issued with respect to the aggravated robbery conviction as well as the aggravated murder conviction.

### I.

The narrow issue before this Court on remand is the admissibility of two incriminating statements Clark made to Willoughby, Ohio police officers on December 13, 1975. On that date Clark made four statements to the police: the first and second at a Cleveland police station, the third at the Arco gas station in Willoughby where the crimes took place, and the fourth at the Willoughby police station. The trial judge granted Clark's motion to suppress the second and third statements but admitted the first and fourth statements. This Court's task is to assess Clark's Fourth, Fifth, Sixth and Fourteenth Amendment objections to the admission of those statements.

The procedural posture in which this case is presented invites a mixture of chagrin and incredulity. In reviewing the state trial court's decision denying the motion to suppress the two statements, the Sixth Circuit stated that "noticeably absent from the record are many findings of fact or analysis of the applicable law" and concluded that "this absence of fact finding coupled with our doubt as to whether the state trial court utilized the proper legal standards of waiver requires remand for further proceedings by the District Court." 676 F.2d at 1106. The court of appeals repeatedly noted that "[t]he state trial court made no express findings of fact," *Id.* at 1108–09, that its review of Clark's petition was complicated by "the total ab-

sence of fact finding," *Id.* at 1110, and that "there are simply no findings to which we can defer ..." *Id.* at 1113. It therefore ordered that this Court conduct the suppression hearing anew and make appropriate findings of fact. *Id.* at 1110–12 (citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *Elliott v. Morford,* 557 F.2d 1228 (6th Cir.1977), and *Harris v. Oliver,* 645 F.2d 327 (5th Cir.1981)).

Unfortunately, the Sixth Circuit's conclusions about the factual record in the state court proceedings were based upon a manifestly incomplete record in this proceeding. For unexplained reasons, the record originally before this Court and before the Sixth Circuit did not contain the five-page "Opinion Re Defendant's Pretrial Motion to Suppress" issued by the state court trial judge. This opinion was introduced at the July 20, 1984 hearing as Joint Exhibit 1. Title 28 U.S.C. § 2254(d) [1] governs the federal habeas court's review of the state court's findings and provides that under normal circumstances the findings are entitled to deference and a presumption of correctness.

*Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Therefore, even though this Court held the evidentiary hearing mandated by the court of appeals, it may overturn the state court's findings and make factual determinations of its own only if the requirements of § 2254 are satisfied.

## II.

The murder and robbery for which Clark and Willie Jones a.k.a. "Slick Willie" were convicted took place on December 7, 1975 at an Arco gas station in Willoughby. On December 12, 1975, Clark was arrested by Cleveland police officers and charged with an unrelated aggravated robbery which had taken place in Cleveland. Robert Tonne, a Cleveland police officer, testified at trial that he read Clark his *Miranda* rights at the time of arrest; Clark testified that he was read his rights not at the time of arrest but after his arrival at the police station. Clark apparently made no statements that day.

---

**1.** Title 28 U.S.C. § 2254 provides in pertinent part as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

## A. *The First Statement*

On the morning of December 13, 1975, Tonne and Thomas Gibbons, another Cleveland police officer, attempted to interrogate Clark about the Cleveland robbery. Tonne testified that Gibbons read Clark the *Miranda* warnings prior to questioning him; Clark testified that he was not read his rights but asked for an attorney. The state court believed the officers with respect to the *Miranda* rights and Clark with respect to the request for an attorney, stating that Clark "has been read his rights by a Cleveland Detective and had refused to answer and had demanded a lawyer, in a distinctly separate interrogation. Detective Gibbons stated that at that interrogation after the usual *Miranda* warning was read, the defendant was asked if he understood his rights, and he said that he did." Having declined to discuss the Cleveland robbery, Clark was returned to his cell.

Also present at the Cleveland police station that morning were three Willoughby police officers, Clifford Collins, Lawrence Reeves, and Kenneth Eisele. Eisele had previously lifted a latent fingerprint of Clark's from the cash box at the Arco station, had made photographs of that fingerprint and Clark's police file fingerprint, and had obtained a warrant for Clark's arrest from Elton Vogel, a Willoughby police detective who also served as Deputy Clerk of the Willoughby Municipal Court. The three officers travelled to Cleveland seeking information from the city's police about Clark's whereabouts; in addition, Eisele wished to review the fingerprint photographs with Robert Burt, the Cleveland police department's fingerprint expert. The officers arrived at Cleveland police headquarters at approximately 9:00 a.m. Neither Collins, Reeves, nor Eisele knew that Clark was in custody; neither Tonne nor Gibbons knew that Clark was a suspect in the Willoughby murder-robbery. The Willoughby officers proceeded to the Scientific Investigation Unit ("SIU") and the Record Unit, both located on the third floor. At that time, Clark was in his cell on the fourth floor.

Tonne and Gibbons met Collins, Reeves and Eisele at the SIU. The Willoughby officers told the Cleveland officers about the fingerprint and arrest warrant and were told in turn that Clark was in custody on the fourth floor. Tonne and Gibbons took the fingerprint photographs and arrest warrant, went to the fourth floor, and had Clark brought out of his cell. Clark was not provided with a lawyer. When Clark entered the room, the Cleveland officers did not read him the *Miranda* rights for a second time. They confronted him with the photographs and the arrest warrant. Clark then indicated that he wanted to talk to the Willoughby officers. The Cleveland officers did not question Clark about the Willoughby charges; instead, they went to get the Willoughby officers and brought Collins and Reeves to the room where Clark was being kept. Tonne and Gibbons introduced Collins and Reeves to Clark and left the room.

The state court made the following findings of fact with respect to the subsequent actions.

This Court finds from the facts presented that on December 13, 1975, the defendant came into contact with two officers of the Willoughby Police Department, Mr. Collins and Mr. Reeves. This was not defendant's first confrontation with law enforcement. He had previous interrogatory confrontations and had on other occasions been informed of his rights under such circumstances. He was not illiterate and admittedly had progressed in school to the eleventh grade....[2] Mr. Collins of the Willoughby Police Department read the "Miranda Warning" to defendant upon first contact. The defendant stated that he knew his rights and wanted to cooperate and did cooperate with an inculpatory statement. This factual fabric was corroborated by Detective Reeves. These two officers both testified that when defend-

---

**2.** The portions of the opinion replaced by the ellipsis summarize the *Miranda* warnings given to Clark by Gibbons and Tonne earlier in the morning, and were quoted previously.

ant was requested to reduce his oral statement to writing[,] Defendant demurred and said that he wished an attorney. At that point he was returned to the detention facility.

It is undisputed that Clark did not sign a written waiver of his rights. Collins and Reeves both testified that Clark made an oral statement implicating himself in the robbery of the Arco station. Clark points out certain alleged inconsistencies in the testimony of Collins, Reeves and Eisele,[3] but does not directly challenge the state court's conclusion that Collins read Clark his rights and that Clark made an inculpatory statement. Under § 2254(d), this Court therefore accepts those findings of fact as true.

After Clark requested counsel and indicated he did not want to talk to the Willoughby officers any more, he was returned to his cell.

### B. *The Second Statement*

The Willoughby officers then made plans to transport Clark to Willoughby. Eisele testified that Clark told the Willoughby officers in the hallway that he wanted to cooperate and make a statement. The officers did not read him a complete *Miranda* warning. Clark then allegedly made a statement describing the gun used at the Arco station. The officers indicated their desire to have Clark make a written statement, prepared an interview room, and located a stenographer. Clark was read his *Miranda* rights and demanded counsel.

No written statement was taken. His oral statement concerning the gun was suppressed by the state court, which stated:

> Clearly any statement made by defendant after his original meeting with the officers of the Willoughby Police Department would amount to continued questioning after an expression by defendant that he wished to consult an attorney absent extenuating circumstances wherein the defendant being fully aware of his rights reopened the dialogue.

### C. *The Third Statement*

During the ride to Willoughby, Collins asked Clark if he would go to the Arco station and point out where the crime took place. With or without Clark's consent, the parties went to the gas station. Clark allegedly made a third statement. For the same reasons cited with respect to the second statement, the state court granted Clark's motion to suppress the third statement.

### D. *The Fourth Statement*

Clark's fourth statement occurred after he arrived at the Willoughby police station, was processed, and was fed. At about 2:30 p.m., as Clark was being prepared for his return to Cleveland, he allegedly told the officers again that he wanted to make a statement and cooperate. Whether Clark asked for an attorney or not is disputed.[4] In any event, Clark then executed a copy of the Willoughby police rights form which included an express waiver of the right to

---

**3.** Among the alleged inconsistencies cited in Clark's post-hearing memorandum are:

(1) Collins and Reeves described Clark's demeanor as calm while the Cleveland officers said that he was nervous and excited;

(2) Collins testified that Clark discussed the photographs he was shown while Reeves denied there was any discussion about the fingerprint photographs.

(3) Collins stated that Clark asked for a lawyer immediately after inculpating himself in aggravated murder while Reeves claimed that Clark asked for a lawyer after he had given an oral "statement."

(4) Collins stated that the interview with Clark took 30 to 45 minutes while Reeves put the time at 15 to 20 minutes.

(5) Collins did not recall Eisele being present at the interview while Eisele stated that he was there, read the warrant to Clark and explained the fingerprint photographs to the defendant.

In light of the length of time between the events and this Court's hearing this summer, these alleged inconsistencies do not provide adequate grounds under § 2254(d) to call into question the state court's conclusion that Clark was read his rights, made an oral statement, and then asked for an attorney.

**4.** At the state court hearing, the officers and Clark offered different accounts on this point. The officers' testimony at the hearing before this Court did not address the question. Clark did not testify.

counsel.[5] At the state court hearing, Clark stated that he signed the waiver after being assured that his cooperation would be explained by the prosecutor to the court, and that his willingness to give the name of his accomplice was contingent upon receiving such guarantees.

The police prosecutor, Clifton Jones, arrived and advised Clark of his *Miranda* warnings. A tape machine recorded the conversation. Jones explained to Clark that he lacked the power to control a court's disposition of Clark's case. Clark indicated that he understood both the *Miranda* warnings and Jones' *caveat*. At Clark's request, the tape recorder was turned off. Clark then made another statement concerning his involvement in the Arco station crimes. He refused a request to reduce the statement to writing and demanded counsel. The court denied the motion to suppress and Reeves testified about the statement at trial. The court's findings of fact were as follows:

At the Willoughby Police Station, the defendant evinced a desire to cooperate or to turn "State's Evidence" if there was a promise that his cooperation would be made a matter of record and passed on to the prosecutor and judge. Officer Reeves wrote a note somewhat to this effect, however, this note was destroyed. Prosecutor Pat Jones appeared at the Willoughby Police Station and read the defendant the *Miranda* warning and asked defendant if there was anything he wished to ask. The defendant in response asked:

"* * * if I really tell who really did it, you understand, I mean, that means I really get charged with he same thing still?"

In answer, Mr. Jones informed the defendant that he could make no promises. To this, the defendant responded:

"Well really I wanted to turn State's Evidence, that's what I really wanted to do."

After the motions to suppress the first and fourth statements were denied, and the state presented its case to the jury, Clark was convicted of aggravated murder and aggravated robbery. As noted earlier, the Sixth Circuit's holding concerning the defective jury instructions compels the state to retry Clark on the aggravated murder charge.

### III.

In this action, Clark originally raised Fifth, Sixth, and Fourteenth Amendment challenges to the state court ruling admitting the first and fourth statements. On remand he adds a claim that the arrest warrant was issued in violation of the Fourth Amendment.

---

5. *The completed form states:*
VOLUNTARY STATEMENT—WAIVER OF RIGHT TO PRESENCE AND ADVICE OF A LAWYER FREE OF [COST TO] ME IF I AM INDIGENT. Date 12–13–1975 TIME 2:30 PM PLACE Willoughby Police Dept. I, Jimmie Lee Clark am 21 years of age, my address is 9713 Heath Avenue Cleveland, Ohio
I have been cautioned by Det. Laurence M. Reeves who has identified himself as a WILLOUGHBY POLICE OFFICER, and who has warned me as follows:
WARNING
I am a police officer, I warn you that anything you say may be used in a Court of Law against you; That you have an absolute right to remain silent; That you have the right to the advice of a lawyer *before* and the presence of a lawyer here with you *during* questioning, and That, if you cannot afford a lawyer, one will be furnished for you free before any questioning if you desire.
I hereby state that I want to make a statement without a lawyer, that is to say, give up and do without the right to talk to a lawyer and ask his advice before I make a statement, and also I wish to give up and do without having a lawyer present with me during the time when questions are asked me and during the time when I answer those questions. I am willing to make the following statement to the above person, knowing that any statement I make may be used against me in Court and that I have an absolute right to remain silent. I declare that the following statement is made of my own free will and without anyone having promised me anything or offered out to me any hope of reward, and I make this statement without any fear of physical harm, without anyone having offered to do me any favor and without anyone promising me leniency.
I further state that I am able to read and write the English language and have completed ...... years of school.
WITNESSES
SIGNED /s/ Jimmy Clark
/s/ Sgt. Clifford J. Collins
/s/ Det. Laurence M. Reeves

### A. *Fifth Amendment: Presence of Counsel*

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney. In defining this constitutional right to have counsel present during such an interrogation, the Court stated:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Id.* at 473–74, 86 S.Ct. at 1627–28.

Subsequent cases have repeatedly found it inconsistent with *Miranda* for authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (and cases cited therein).

*Miranda* did not, however, preclude waiver of the right to counsel, even after the defendant has requested a lawyer. Rather, *Miranda* incorporates pre-existing standards governing such waivers:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. State of Illinois*, 378 U.S. 478, 490 n. 14 ... [84 S.Ct. 1758, 1765 n. 14, 12 L.Ed.2d 977 (1964)]. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458 ... [58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we reassert these standards as applied to in-custody interrogation....

384 U.S. at 475, 86 S.Ct. at 1628.

Under *Johnson*, waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 304 U.S. at 464, 58 S.Ct. at 1023.

With *Miranda's* constraints on in-custody interrogation and waiver of the right to counsel in mind, this Court must assess the state court's findings concerning Clark's first and fourth statements.[6] Also in mind

---

**6.** The Sixth Circuit, 676 F.2d at 1111, indicated that the waiver question is governed by the additional prophylactic rule promulgated in *Edwards v. Arizona*:

> ... [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

is the Supreme Court's admonition that the propriety of the interrogation and the legitimacy of the waiver require separate inquiries, "and clarity of application is not gained by melding them together." *Oregon v. Bradshaw*, 462 U.S. 1039, ——, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (plurality opinion).

### 1. *The First Statement*

The state court's analysis of Clark's first statement to the Willoughby police culminated in the following conclusion of law:

> ... In support of his motion [to suppress], defendant refers to the unpublished case of *State of Ohio v. Leonard DeFazio*, Case No. 614, Court of Appeals of Ohio, Eleventh District. Mr. DeFazio stated that he was willing to talk to an investigating officer because he didn't think that talking to him would be damaging. He allegedly said: "I won't sign nothing but I'll answer questions." Such a declaration is not present in this case. However, the DeFazio court relied upon ·*State v. Jones*, 37 Ohio St.2d 21 [306 N.E.2d 409], wherein the Ohio Supreme Court upheld:
>
> > " * * * when a defendant subsequently acts in such a way as to reasonably alert an interrogating officer that the warnings given have been misapprehended, the officer must, before any further questioning, insure that the defendant fully and correctly understands his Fifth Amendment Rights." ([37 Ohio St.2d] pages 26–27 [306 N.E.2d 409]).

The defendant in Jones willingly engaged in conversation with a detective until the detective started to take notes; at that point, Jones refused to speak further if anything was written down." Such a point was reached in the instant case and further interrogation was stopped. A telling portion of *State v. Jones* is found [37 Ohio St.2d] at page 26 [306 N.E.2d 409]:

> "Although appellant's conduct at police headquarters may be susceptible to various interpretations, the record fails to negate one interpretation fatal to the state's case—that appellant misunderstood the legal effect of his speaking to Detective Powell."

Mr. Clark, the defendant, stated in testimony upon his hearing that he knew the oral statements made by him could be used against him. This admission on the record negates the interpretation that he misunderstood the legal effect of his speaking to Detectives Collins and Reeves.

This conclusion is consistent with the court's factual finding that Clark was a literate, seasoned veteran of the criminal justice system who knew his rights, wanted to cooperate with the Willoughby police officers, and did so cooperate. With respect to the waiver issue, the opinion also partially quells the Sixth Circuit's "doubt concerning the application of correct legal standards," since the cited case, *State v. Jones*, itself cites both *Miranda* and *Johnson* in an accurate and detailed discussion of principles governing waiver of funda-

---

451 U.S. at 484–85, 101 S.Ct. at 1884–85.

The Supreme Court has now determined that this rule should not be retroactively applied in collateral reviews of pre-*Edwards* final convictions. *Solem v. Stumes*, —— U.S. ——, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984). In such cases, of which this is one, the *Solem* Court set forth this controlling standard:

> ... Prior to *Edwards*, the emphasis in our cases had been on whether, as an individual, case-by-case matter, a waiver of the right to counsel had been knowing, voluntary, and intelligent. See *Johnson v. Zerbst* ... As we said in *North Carolina v. Butler*, 441 U.S. 369, 374–75 [99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286] ... (1979), relying on *Johnson* and treat-

ing the Fifth Amendment right to counsel as *a fortiori*, "[e]ven when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular set of facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" There we saw "no reason to discard that standard, and replace it with an inflexible *per se* rule." *Id.*, at 375 [99 S.Ct. at 1758].... The *Miranda* majority viewed the waiver question as controlled by *Johnson*, 384 U.S., at 475 [86 S.Ct. at 1628] ...

104 S.Ct. at 1344. In sum, *Miranda* and *Johnson*, not *Edwards*, govern the waiver issue.

mental constitutional rights. No evidence presented during the evidentiary hearing conducted by this Court calls the state court's findings on the waiver issue into question. Recalling "our obligation to defer to the findings of the state courts," and acknowledging application of the correct standard, this Court finds that, if the interrogation of Clark was permissible in the first place, the finding that he waived his right to counsel must be sustained. If, however, the questioning of Clark was improper, then the "next inquiry" into the circumstances of the waiver is simply irrelevant. *Oregon v. Bradshaw*, 103 S.Ct. at 2835.

The crucial sentence in *Miranda* holds that once the suspect has been advised of his Fifth Amendment right to counsel, "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. at 1628. This language has consistently been regarded as a *per se* rule barring further interrogation after assertion of the right to counsel. *Edwards v. Arizona*, 451 U.S. at 485–86, 101 S.Ct. at 1885; *Rhode Island v. Innis*, 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980); *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979) (discussing *Miranda*'s "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease."); *Michigan v. Mosley*, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975); *Id.* at 109, 96 S.Ct. at 329 (White, J., concurring) ("*per se* rule against further interrogation after assertion of a right"); *see Solem v. Stumes*, 104 S.Ct. at 1349 (Stevens, J., dissenting) ("Indeed, this language forbids the police even to ask if the individual wishes to waive his rights, since 'there can be no questioning.'"). The state court apparently recognized this standard when it suppressed the second and third statements on the grounds that "any statement made by defendant after his original meeting with the officers of the Willoughby Police Department would amount to continued questioning after an expression by defendant that he wished to consult an

attorney absent extenuating circumstances wherein the defendant being fully aware of his rights reopened the dialogue." But the state court also made a finding of fact that Clark asked for an attorney during his first interview with the Cleveland officers. Since there is no evidence in the record that Clark waived his right to an attorney between the time he was returned to his cell and the time he next encountered officers Tonne and Gibbons, the issue is whether the session which began in their second visit to him—accompanied by the arrest warrant and fingerprint photographs—and culminating in his first statement to the Willoughby officers, constituted an "interrogation" forbidden by *Miranda*.

*Rhode Island v. Innis* clarified what activities are forbidden once a suspect asks for counsel:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. The focus reflects the fact that *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reason-

ably likely to elicit an incriminating response.

*Id.* 446 U.S. at 300–02, 100 S.Ct. at 1689–90 (emphasis in original) (footnotes omitted).

In *Innis,* a suspect in a robbery and murder was arrested and read his *Miranda* rights. He stated that he understood his rights and wanted a lawyer. Police officers then placed the suspect, Innis, in the back seat of a patrol car. The officers entered the vehicle and discussed the shotgun which had been used in the crimes, whose location was not known. One officer told the others that "it would be too bad if ... a girl—would pick up the gun, maybe kill herself." Innis then interrupted the conversation and told the officers to run the car around so he could show them where the gun was located. The officers and Innis returned to the scene of the arrest. Innis was read his *Miranda* rights again but proceeded to lead the police to the site of the shotgun. He was later convicted of kidnapping, robbery and murder. 446 U.S. at 293–96, 100 S.Ct. at 1686–87.

The Supreme Court held that the officers' conduct did not violate *Miranda:*

> ... [Innis] was not "interrogated" within the meaning of *Miranda.* It is undisputed that the first prong of the definition of "interrogation" was not yet satisfied, for the conversation between [the officers] included no express questioning of the respondent. Rather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited.
>
> Moreover, it cannot be fairly concluded that the respondent was subjected to the "functional equivalent" of questioning. It cannot be said, in short, that [the officers] should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent....
>
> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

446 U.S. at 302–03, 100 S.Ct. at 1690–91 (footnote omitted). The Court concluded that comments which involve "subtle compulsion" are not necessarily "interrogation": "It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.*

The Sixth Circuit addressed *Innis* in *United States v. Avery,* 717 F.2d 1020 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984). After defendant Avery had been read his *Miranda* rights and contacted his attorney by telephone, the attorney told police detective Payne that his client did not wish to make a statement. While the detective completed Avery's identification form, he asked the defendant "several questions on such topics as the defendant's address and date of birth. Payne also used the defendant's driver's license as a source of information. The defendant was also fingerprinted and photographed." *Id.* at 1022. After the booking process was completed, and a third officer left the room, the defendant suddenly made an incriminating statement to detective Payne. The statement was admitted at trial after the court concluded that Avery had waived his privilege against self-incrimination. Affirming, the court of appeals stated:

We believe the questioning in this case falls outside the context of the inherently coercive custodial interrogation for which the *Miranda* safeguards were designed, ... and thus should not be characterized as "interrogation." The record indicates that the questions were part of a routine procedure to secure biographical data to complete the booking process. These questions did not relate, even tangentially, ·to criminal activity. Moreover, there is no evidence that the defendant was particularly susceptible to these questions, or that police somehow used the questions to elicit an incriminating response from the defendant....

*Id.* at 1024 (citation omitted).

The *Avery* court acknowledged, however, "that courts should carefully scrutinize the factual setting of each encounter of this type" because "[e]ven a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Id.* at 1025.

 This Court finds that ·the circumstances of Clark's first statement pose precisely this problem, rendering the case readily distinguishable from *Innis* or *Avery.* When Tonne and Gibbons confronted Clark with the arrest warrant, and particularly with the photographs of the fingerprints, they were conducting the functional equivalent of interrogation, defined in *Innis* as "actions on the part of the police ... that the police know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. at 1690. Moreover, unlike the questions in *Avery*, the arrest warrant and fingerprint photographs related, not just tangentially,

but directly, to criminal activity. The Cleveland officers' actions therefore violated *Miranda's·* prohibition on custodial interrogation following a request for counsel. The immediate product of their illegal interrogation—Clark's decision to make a statement to the Willoughby officers—is irreparably tainted. It follows that the statement itself is tainted as well, for the Willoughby officers' rereading of Clark's *Miranda* rights cannot fairly be said to have undone the prior wrong. The state court's finding that Clark's waiver of his right to counsel prior to making his first statement was knowing, voluntary or intelligent, under the totality of the circumstances, is therefore irrelevant. When a defendant has "expressed his view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." *Michigan v. Mosley*, 423 U.S. at 110 n. 2, 96 S.Ct. at 329 n. 2 (White, J., concurring); *Wyrick v. Fields*, 459 U.S. 42, 53, 103 S.Ct. 394, 399, 74 L.Ed.2d 214 (1982) (Marshall, J., dissenting). When the proximate cause of the decision to make the statement was an illegal interrogation, the statement must be suppressed. The state court therefore erred in permitting Clark's first statement to the Willoughby police to be read to the jury.[7]

## 2. *The Fourth Statement*

The state court's findings of fact with respect to Clark's statement at the Willoughby police station were followed by this legal conclusion:

---

7. This Court acknowledges that its decision applying pre-*Edwards* law to difficult questions of interrogation and waiver has plunged it nonetheless into the Supreme Court's tangled attempts to delineate the relationship between *Edwards, Miranda,* and *Miranda*'s pre-*Edwards* progeny. In *Solem v. Stumes,* the majority insisted that prior to *Edwards,* courts interpreting *Miranda* could justifiably believe "that a waiver of the right to counsel following its invocation could be voluntary even if police initiated the · *conversation."* 104 S.Ct. at 1344 (emphasis add-

ed). The dissent contended that "it was well settled long before *Edwards* was decided that police may not *interrogate* a prisoner after he had asked for the assistance of a lawyer." *Id.* at 1348 (emphasis added). This Court's holding is consistent with either interpretation of *Miranda,* for the Cleveland officers' second interview with Clark, which gave rise to the first statement to the Willoughby officers, was no mere "conversation" but an "interrogation" expressly forbidden by *Miranda* and *Innis.*

It is clear from the total testimony that at this point, Mr. Clark wanted to make the best deal that he possibly could. Mr. Clark testified that he clearly understood his rights after they were read by Mr. Jones. It must reasonably follow that having been given the appropriate *Miranda* warning and understanding it and having expressed a desire to exculpate himself, any statement given by defendant must have been voluntary. (See *State v. Conley*, 32 Ohio App.2d 54, at 58 [, 288 N.E.2d 296]).

As with the first statement, the state court applied a state court case which incorporated the appropriate federal constitutional standards. *State v. Conley*, 32 Ohio App.2d 54, 296, 288 N.E.2d 296 (Marion County 1971), discusses *Miranda* and follows, *sub silentio, Johnson v. Zerbst*, in affirming the admission of incriminating statements which "were freely and voluntarily given by one fully aware of his rights." 288 N.E.2d at 296 (quoting *State v. Perry*, 14 Ohio St.2d 256, 237 N.E.2d 891 (1968)). Again, absent any evidence of an improper interrogation, considerable deference must be paid to the state court's finding that Clark properly waived his rights.

This deference does not end the habeas court's inquiry, however. The court of appeals offered some advice for assessing the fourth statement:

> Although we believe the proper determination of the admissibility of the first statement is a key threshold decision, even if it is deemed to have been unconstitutionally obtained, Clark's fourth statement may be admissible under certain circumstances. If the District Court finds that the fourth statement was a product of Clark's initiative and given without interrogation, it may be admissible. See *Edwards v. Arizona, supra.* However, the psychological effect, if any, on Clark after having made the first statement is also significant in determining the lawfulness of the fourth statement. After an accused has let the cat out of the bag by confession, no matter what the inducement, he may not thereafter be free of the psychological and practical disadvantages of having con-

fessed. *United States v. Bayer*, 331 U.S. 532, 540–41 [67 S.Ct. 1394, 1398, 91 L.Ed. 1654] ... (1947); *Maglio v. Jago*, 580 F.2d 202 (6th Cir.1978).

> On remand, the District Court must also consider the impact, if any, of the police course of conduct throughout the day prior to Clark's alleged initiation of the fourth statement to the police. Finally, the District Court should consider the appellant's age, education, mental state, and all other well-known criteria relevant to the determination of intent and volition to waive constitutional rights....

676 F.2d at 1113 (other citations omitted).

With the state court opinion now a part of the habeas court's record, it is appropriate to defer to that court's conclusion concerning the narrow circumstances of Clark's waiver decision. Whether the inadmissibility of the first statement contaminates the otherwise admissible fourth statement, however, was not before the state court, which failed to address the interrogation issue. On this point, the Sixth Circuit's reference to *Maglio v. Jago* is not merely instructive but decisive. That case concerned two statements by a sixteen-year-old runaway. The court of appeals held inadmissible an inculpatory statement made after prosecutors refused to honor the defendant's express request for counsel. It then turned to a second statement, made after the defendant received a second set of *Miranda* warnings and purportedly executed a knowing and voluntary waiver of his right to counsel.

> ... The State argues that even if the earlier statement was admissible, the later statement, following a careful reexplanation of Maglio's rights, should be admissible. We commend the care with which the prosecutor explained Maglio's rights to him, but nonetheless, the request to see an attorney remained unhonored, and the taped interrogation followed within less than an hour of the illegal questioning....

\*　　\*　　\*　　\*　　\*　　\*

... In this case, the condition which makes the first confession inadmissible, the failure to provide counsel to an accused during an interrogation, had not yet been removed. Therefore, the recorded statement is equally inadmissible.

580 F.2d at 207 (footnote omitted).

■ Although a somewhat longer period of time elapsed between Clark's two statements, this case is otherwise indistinguishable from *Maglio*, and clearly falls within its holding that failure by police to comply with a *Miranda* request for counsel renders inadmissible any statements made during interrogations until such time as counsel is provided. The state court therefore erred in admitting Clark's fourth statement in evidence before the jury. It too must be suppressed.

### B. *Other Claims*

In light of this resolution of Clark's claims with respect to his Fifth and Fourteenth Amendment right to presence of counsel, this Court need not address his contentions with respect to the related *Miranda* right to remain silent. Nor should it address his Fourth Amendment challenge to the validity of the arrest warrant or his Sixth Amendment claim concerning the right to counsel. Three principles bar review of the Fourth Amendment claim: it was not raised before the state judiciary, and no good cause for that default has been asserted and demonstrated, *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); it was not mentioned in the petition for writ of habeas corpus filed with this Court on June 18, 1980; and, even if it were properly before this Court, litigation of Fourth Amendment claims in federal habeas actions is barred by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). As for the Sixth Amendment claim, it was not raised before the highest state court; and, in any event, *United States v. Gouveia,* — U.S. —, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984), resolved the issue against Clark by holding that "the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant."

### IV.

Pursuant to the Sixth Circuit's mandate and the preceding discussion, the petition for writ of habeas corpus is granted. Unless the State chooses to retry Clark within sixty (60) days of the filing of this Memorandum and Order, using appropriate jury instructions on the aggravated murder charge and making no use of illegally obtained statements, Clark shall be released from the custody resulting from his 1975 convictions.

IT IS SO ORDERED.